

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,109

**ROBERT SOLIS, Appellant**

v.

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 164780601010
### IN THE 230TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY

FINLEY, J., delivered the opinion of the Court in which RICHARDSON, NEWELL, KEEL, MCCLURE, and PARKER, JJ., joined, and in which SCHENCK, P.J., joined except for Part VII, and in which YEARY, J., joined except for Part IV. WALKER, J., concurred.

### O P I N I O N

In October 2022, Appellant was tried for and convicted of capital murder

pursuant to Section 19.03(a)(1) of the Penal Code for committing the murder

of Harris County Sheriff's Deputy Sandeep Dhaliwal during a traffic stop. *See* TEX. PENAL CODE § 19.03(a)(1). On the basis of the jury's answers to the statutorily required special issues, Appellant was sentenced to death. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b), (e). Direct appeal to this Court is automatic. *Id.*, § 2(h). Appellant raises eight points of error. Finding no reversible error, we affirm Appellant's conviction and sentence of death.

## I.     Facts

### a. Guilt Phase Evidence

Viewed in the light most favorable to the verdict, the evidence and the reasonable inferences from it showed the following. On September 27, 2019, Dhaliwal was a certified peace officer employed by the Harris County Sheriff's Office (HCSO) as a patrol deputy. Shortly before noon, he was on duty, wearing his HCSO uniform and monitoring an intersection in a residential area of northeast Houston for traffic violations.

From his clearly marked patrol car, Dhaliwal observed a silver Nissan Altima sedan fail to come to a complete stop at an intersection. Dhaliwal activated his patrol car's lights and siren, which automatically activated the vehicle's dashcam, and initiated a traffic stop. Following his training and HCSO policy, Dhaliwal activated his bodycam before approaching the Nissan,

and he touched the rear of the vehicle with his hand to leave his fingerprints on the car.

Unbeknownst to Dhaliwal, Appellant was driving the Nissan, which he had borrowed from his sister earlier that day. Appellant was a convicted felon with an active warrant for his arrest due to a parole violation. Appellant was also armed with his sister's loaded semiautomatic handgun and two spare 10-round ammunition magazines. As Appellant stopped the Nissan in response to the lights and siren, he told his passenger and neighbor, Jennifer Saiz, about his outstanding warrant. Appellant predicted that he was "going to jail[,]" and he repeatedly expressed that he did not want that to happen.

During his interaction with Dhaliwal, Appellant claimed not to have any identification with him, lied about his name and date of birth, and falsely claimed to be in the military and to live in another state. Appellant also claimed not to know his address, driver's license number, or social security number. Because Saiz knew Appellant was lying to Dhaliwal and she suspected that Appellant was about to be arrested on the warrant, she asked the deputy if she could leave. Dhaliwal allowed Saiz to do so, and she got out of the car, began walking to her house, and called her boyfriend Larry Covey to pick her up. Saiz testified that she was familiar with Dhaliwal, who regularly patrolled the neighborhood. She agreed that while she was present

during the traffic stop, Dhaliwal was "the same polite, kind and respectful man he always was."

After Saiz left, Dhaliwal radioed for a mobile fingerprint scanner to be brought to his location, informed Appellant that he was detained until his identity could be verified, and walked back to his patrol car. While Dhaliwal was standing next to the patrol car, turned away from Appellant and writing on his notepad, Appellant exited the Nissan holding his sister's loaded handgun. He brought the weapon to eye level, pointed it directly at Dhaliwal, and then ran at Dhaliwal and shoved him against the patrol car. Although Dhaliwal raised his arms in submission, Appellant shot the deputy in the head at close range, inflicting a fatal injury. After shooting Dhaliwal, Appellant rushed back to his sister's car and drove away. At trial, Appellant's sister identified Appellant's voice on Dhaliwal's bodycam video and Appellant as the person shown on a still photo from the video, holding her handgun and getting back into the Nissan immediately after the shooting.

Within moments of killing Dhaliwal, Appellant began calling Saiz and then Covey. Appellant separately told each of them that he had shot Dhaliwal, and in an apparent effort to distance himself from his sister's car, asked them for a ride. Saiz and Covey both refused to help Appellant.

Appellant subsequently drove the Nissan to a nearby shopping center, parked the car in the parking lot, took the keys, and walked around the center for a period of time. He ultimately dumped his sister's handgun and the two spare ammunition magazines in a trash can outside an ice cream shop that was next to a children's daycare center. The handgun was still loaded, with a bullet in the chamber.[1] Appellant then entered the ice cream shop, hid his sister's car keys in a potted plant inside the business, and called her to tell her where she could retrieve the keys.

Meanwhile, an intensive multi-agency manhunt was underway for Dhaliwal's shooter. Investigators searching for the Nissan quickly located it at the shopping center where Appellant had left it, and they began cordoning off the area, restricting entry and egress. Officers who later processed the Nissan for evidence found Dhaliwal's fingerprints on the rear of the vehicle.

Appellant, who had been lingering inside the ice cream shop for approximately thirty minutes without purchasing anything, repeatedly asked

---

[1] Investigators recovered the pistol and ammunition, and the State's firearms expert testified that the pistol fired the shot that killed Dhaliwal. In addition, various areas of the pistol, including the trigger, were swabbed and tested for DNA. The State's DNA analyst testified that a mixture of DNA from two individuals was found on the trigger, and that mixture was "approximately eight quadrillion times more likely to have originated from [Appellant] and another individual than to have originated from two other individuals." The analyst further testified that the results of this analysis "provide[d] very strong support for the proposition that [Appellant] was a contributor to the DNA obtained from" the trigger.

the owner about the heavy police presence forming outside. Appellant also pretended to be a shop employee by moving tables to the business's patio, although the owner did not ask Appellant for assistance and did not want Appellant's help.

Eventually, Appellant approached one of the law enforcement officers securing the perimeter at this secondary scene, asking the officer what was happening and whether Appellant could leave. When the officer noticed that Appellant matched the shooter's description, he asked Appellant to identify himself. The officer detained Appellant after he gave a false name. Once detained, Appellant became argumentative and aggressive, refused to submit to gunshot residue testing, and clenched his hands so that officers could not fingerprint him using a mobile fingerprint scanner. Shortly thereafter, Appellant was taken into custody, but not before blowing a kiss at one of the arresting officers.

Appellant testified in his own defense and admitted that he shot and killed Dhaliwal, but he contended that it was an accident. Appellant, who disputed that he had actually committed a traffic violation, told the jury that he decided to place Dhaliwal under a citizen's arrest for falsely imprisoning him. Appellant testified that he then accidentally shot Dhaliwal in the head when the deputy "jerked pretty quickly" while Appellant was trying to reach

the deputy's handcuffs. On cross-examination, Appellant admitted that Dhaliwal was a peace officer acting in the line of duty at the time of the shooting. Appellant further confirmed that Dhaliwal was "very polite" and "very respectful" to him during the traffic stop but stated that he nonetheless perceived "microaggressions" from the deputy that prompted him to attempt the citizen's arrest. The jury implicitly rejected Appellant's accident defense by finding him guilty of capital murder as alleged in the indictment.

### b. Punishment Phase Evidence

At the punishment phase, the State introduced evidence of Appellant's juvenile and adult criminal record, as well as his prison disciplinary record and unadjudicated bad acts. Viewed in the light most favorable to the jury's answers to the punishment phase special issues, this evidence and the reasonable inferences from it collectively showed as follows.

Appellant was forty-seven years old when he murdered Dhaliwal, an act for which Appellant evidenced no remorse, and the capital offense was the culmination of a lengthy history of escalating violence and antisocial behavior. As a fourteen-year-old, Appellant sexually assaulted his mother's romantic partner Shauntel Lyons while she was recovering from a severe and painful burn injury. Due to the injury itself and the effects of her pain medication, Lyons was unable to fight Appellant off; he "[p]ut his penis in [her] and raped

[her]."[2] As an older juvenile, Appellant was placed on deferred adjudication for burglarizing a string of homes and stealing property that included handguns. Around this same time, Appellant was arrested for unlawfully carrying a weapon—a .380 semiautomatic pistol and two fully loaded magazines of ammunition—and he later committed felony theft.

While Appellant was in his twenties, he statutorily raped and repeatedly physically assaulted the mother of his three children, hog-tied his own mother, set his sister's room on fire, and fired a gun toward the foot of one of his sons. In 2002, when Appellant was twenty-nine years old, he shot a man and then engaged in an hours-long armed standoff with police in which he used his four-year-old son as a human shield. Appellant was convicted of aggravated assault and aggravated kidnapping as a result of this incident and sentenced to twenty years in prison. Numerous correctional officers who encountered Appellant during his imprisonment testified to his entitled, combative attitude and disciplinary infractions. These infractions included creating disturbances, possessing weapons and contraband, fighting, and assaulting a prison guard.

---

[2] As we will discuss in further detail regarding point of error one, Appellant represented himself at trial. At the end of cross-examining Lyons, Appellant personally "conced[ed] to the State that the event" (i.e., his sexual assault of Lyons) "happened."

Appellant's misdeeds continued after his 2014 release from prison on parole under a "Super Intense Specialized Program," which required him to wear a GPS tracker and adhere to various conditions. Appellant's maternal aunt and her husband provided him with a job, free corporate housing, transportation to his required appointments, and other significant support. Appellant did well until his GPS monitor was removed, when his attitude and conduct changed for the worse. Appellant rewarded his aunt and uncle for their support by stealing approximately $20,000 from his uncle's company. When his uncle confronted Appellant about the missing funds and terminated his employment, Appellant—who bragged about having weapons—threatened, "[I]f you ever try to take me down, I'll take you down with me."

When he was terminated from his uncle's company, Appellant was already involved in a financially-exploitative relationship with Alyssa Ascenscio, whose husband had recently died from cancer. Ascencio was left with two young children—one of whom (Ascenscio's daughter M.A.) had also been diagnosed with cancer shortly before the husband's death—and a considerable sum of money in insurance proceeds. Appellant openly disparaged Ascencio to his friends and relatives and stated that he had no romantic feelings for her. However, Appellant pretended to Ascencio that he did have such feelings, and he readily accepted her many expensive material gifts. After

being terminated from his uncle's company, Appellant moved in with Ascencio and her children.

Appellant thereafter gained such psychological control over Ascencio that he manipulated her into transferring significant amounts of money to him under the pretense that he would use the funds to start a business. Appellant instead spent these funds on online gambling, prostitutes, martial arts lessons, and material items he desired. Appellant also manipulated Ascencio into buying him firearms and large quantities of ammunition and transferring valuable items of her personal property into his name.

In late 2016, Ascencio's assets were largely gone as a result of Appellant's machinations, and she was depressed and anxious over her future and how she would provide for her children. In December 2016, Appellant, impatient with Ascensio's emotional state, assaulted her. He struck her numerous times and threatened her with a semiautomatic pistol. He repeatedly asked Ascencio if she wanted to die and fired a bullet next to her head while forcing her to say that she did want to die.

Some days later, after receiving support from her relatives and friends, Ascensio filed a police report. In early January 2017, Ascensio also provided Appellant's parole officer with an affidavit detailing the December 2016 assault. Shortly afterward, a "blue warrant" for Appellant's arrest issued, and

he absconded from parole.[3] Then, in mid-January 2017, Appellant murdered Ascencio in her home to prevent her from testifying at his parole revocation hearing, and he staged her body to look like she had committed suicide.[4]

M.A., who was in fifth grade at the time, witnessed Appellant's terrifying December assault on her mother and testified that he also pointed a gun at her during the incident. In addition, M.A. found her mother's body after the staged suicide. M.A. further testified that Appellant sexually abused her while he was living under her mother's roof.

The State also presented evidence that Appellant orchestrated a drug smuggling and distribution ring while in jail awaiting trial in this case. More specifically, Appellant enlisted individuals inside and outside the jail to assist him with obtaining and distributing "spiced paper" (paper infused with various illicit drugs) to other jail inmates for profit. In at least one instance, as a lesson and show of power, Appellant arranged for paper infused with toxic chemicals instead of the desired drugs (a "Trojan Horse") to be sent to an inmate-

---

[3] This is the same warrant Appellant was seeking to avoid when he murdered Dhaliwal.

[4] The State presented evidence showing Appellant's motive and opportunity to kill Ascencio, as well as evidence that he had previously expressed a willingness to do so. The State additionally presented testimony from two different witnesses, who each stated that Appellant admitted to them that he had been present in Ascencio's home and arguing with her at the time of her death. One of these witnesses also testified that Appellant admitted to her that he had shot Ascencio.

customer who owed him money.

The State additionally presented testimony from clinical and forensic psychologist Dr. Christine Reed, who reviewed Appellant's jail, prison, medical, and mental health records as well as the evidence of the capital offense. Because she did not personally interview Appellant, Reed testified that she did not feel comfortable diagnosing him. However, Reed explained that she was privy to Appellant's prior diagnoses and that her review of his records allowed her to refute or confirm them.

Reed discounted low intelligence as an explanation for Appellant's behavior; Appellant had an above-average IQ, and he had done well when he took college courses in prison. Instead, Reed noted, Appellant was diagnosed with Antisocial Personality Disorder (ASPD), and his history amply supported that diagnosis. Reed also testified that she would be very comfortable with Appellant being diagnosed with Narcissistic Personality Disorder as well, or with narcissistic traits being added to his ASPD diagnosis. Reed testified that both personality disorders are extremely resistant to treatment and that, among other things, narcissists can lash out in violent ways when challenged.

Reed also assessed Appellant using the Hare Psychopathy Checklist (PCL-R) based on her review of his records. Reed testified that Appellant scored a 35 out of 40, and that a score above 30 indicated psychopathy. She

explained that people whose PCL-R scores indicate psychopathy are at greater risk for criminal behavior, including violent reoffending.

Appellant personally cross-examined the State's punishment phase witnesses, but he presented no witnesses of his own. After considering the evidence presented at both phases of trial, the jury returned an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation special issue.

## II.    Legal Sufficiency—Guilt Phase

In his third point of error, Appellant challenges the legal sufficiency of the evidence to support his capital murder conviction.[5] Appellant appears to assert that the evidence was legally insufficient to support his capital murder conviction because five of the State's guilt phase witnesses (Priscilla Garrison, Tracy Lewallen, Hoang Nguyen, Michael Reddicks, and Elias Rivera) "provided no direct evidence" of the offense "and no identification" of Appellant as the perpetrator. Without acknowledging our holdings to the contrary, Appellant conclusorily asserts that "circumstantial actions should not be considered when judging the sufficiency of the evidence."[6]

---

[5] We address Appellant's points of error out of order because we generally first address the issue that would afford Appellant the greatest relief. *See* TEX. R. APP. P. 43.3.

[6] To the extent Appellant intends to raise any other arguments, those arguments are inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

### a. Applicable Law

When reviewing the legal sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Braughton v. State*, 569 S.W.3d 592, 607–608 (Tex. Crim. App. 2018). The *Jackson* standard recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Braughton*, 569 S.W.3d at 608. "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Id.* Therefore, on appellate review, we determine whether the necessary inferences made by the trier of fact are reasonable based on the cumulative force of all of the evidence. *See id.*

### b. Analysis

Appellant's challenge to the legal sufficiency of the guilt phase evidence to support his conviction for capital murder lacks merit. We have repeatedly held that "[c]ircumstantial evidence is as probative as direct evidence in

establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *See, e.g.*, *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014); *see also Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) ("[T]he State may prove [a] defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence."). "[I]t is not necessary that every fact and circumstance point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances." *Acosta*, 429 S.W.3d at 625 (internal quotation marks omitted).

Further, Appellant ignores the fact that Dhaliwal's dashcam and bodycam videos, which were published to the jury, captured the traffic stop, clear images of the driver involved, and almost all aspects of the fatal assault on the deputy.[7] The jury could have reasonably determined from this evidence alone that Appellant was the driver involved in the traffic stop and that he intentionally and knowingly murdered Dhaliwal by shooting him in the head. In addition, at trial, Appellant's own sister viewed a still photo from the video

---

[7] The video did not show Appellant actually shooting Dhaliwal because Dhaliwal's bodycam was front-facing, and Appellant pushed the deputy's chest against the side of the patrol car. However, the dashcam and bodycam footage captured Appellant's armed approach and retreat, between which the shot that killed Dhaliwal can be heard on audio.

and identified Appellant holding her firearm and getting back into her car immediately after the fatal shot rang out. She also identified Appellant's voice on Dhaliwal's bodycam video. Appellant also ignores the testimony that, immediately after the offense, he separately told two different people (Saiz and Covey) that he (Appellant) had just shot Dhaliwal. And, fatal to Appellant's sufficiency challenge, Appellant expressly admitted that he shot and killed Dhaliwal, knowing that Dhaliwal was a peace officer who was then acting in the line of duty.

In sum, the cumulative force of the evidence was more than sufficient for the jury to reasonably find every element of the charged offense beyond a reasonable doubt, including Appellant's identity as the shooter. We overrule Appellant's third point of error.

## III.   Legal Sufficiency—Future Dangerousness

In his fourth point of error, Appellant challenges the legal sufficiency of the evidence to support the jury's affirmative answer to the punishment phase's "future dangerousness" special issue. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1). Instead of applying the *Jackson* standard to the facts of his case,[8] Appellant focuses on the testimony of three punishment phase witnesses

---

[8] To the extent Appellant is attempting to make a different argument, it is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

(Lyons, Harry Hill, and M.A.) and in a conclusory fashion seems to complain about either the admissibility of their testimony or the degree of credibility he believes the jury should have afforded it.[9] After leveling these criticisms at Lyons's, Hill's, and M.A.'s testimony, Appellant closes with the conclusory statement, "When considered with evidence from the guilt phase about the nature of this offense, a rational juror could not have found that the appellant would commit future criminal acts of violence that would constitute a continuing threat to society." Appellant never explains how the complained-of testimony implicates the legal sufficiency of the evidence to support the jury's affirmative finding on the future dangerousness special issue.

### a. Applicable Law

The future dangerousness special issue requires the jury to determine

---

[9] As previously discussed, Lyons testified that Appellant sexually assaulted her when he was about fourteen years old. The sum total of Appellant's argument regarding Lyons's testimony is the statement, "This claim was unreported and allegedly occurred many years before this trial." Appellant fails to acknowledge that he personally admitted in open court that "the event" happened. *See supra* n.2.

Appellant next conclusorily (and incorrectly) asserts that he had no opportunity to cross-examine Hill. When Appellant was prosecuted in 2002 for aggravated assault and aggravated kidnapping, Hill (the shooting victim) testified at the trial and was cross-examined by Appellant's counsel. Hill was deceased by the time of Appellant's capital murder trial, but his direct and cross-examination testimony from the 2002 trial was read into the record.

Appellant lastly complains of M.A.'s testimony that Appellant physically assaulted her mother and sexually abused M.A. Appellant conclusorily calls M.A.'s testimony "[t]he most egregious and unsupported/unreported allegation." He fails to acknowledge that M.A.'s testimony is evidence supporting the allegation.

"whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1). This special issue reflects an "essentially . . . normative" inquiry that focuses on the individual defendant's character for violence, "not merely the quantity or quality of the institutional restraints" imposed upon him. *Coble v. State*, 330 S.W.3d 253, 268–69 (Tex. Crim. App. 2010). "That is, this special issue focuses upon the internal restraints of the individual, not merely the external restraints of incarceration." *Id*. at 269.

In answering the future dangerousness special issue, the jury is entitled to consider all of the evidence admitted at both the guilt and punishment phases of trial. *Devoe v. State*, 354 S.W.3d 457, 461 (Tex. Crim. App. 2011). The jury may consider a variety of factors in reaching its answer. *See Green v. State*, 713 S.W.3d 865, 878 (Tex. Crim. App. 2025). These factors include the circumstances of the offense and the events surrounding it, including forethought and deliberateness in its execution; the existence and severity of past crimes; the defendant's age and personal circumstances at the time of the offense; psychiatric evidence; and character evidence. *Id*. The jury may additionally consider escalating patterns of violence and disrespect for the law. *Id*. In some instances, the circumstances of the offense and the events

surrounding it may be sufficient in themselves to sustain an affirmative answer to the future dangerousness special issue. *Devoe*, 354 S.W.3d at 462.

When reviewing the sufficiency of the evidence to support the jury's affirmative answer to the future dangerousness special issue, we employ the *Jackson* standard, viewing the evidence in the light most favorable to the verdict. *See Green*, 713 S.W.3d at 878; *see also Jackson*, 443 U.S. at 319. We determine whether, based on the evidence and reasonable inferences from it, any rational trier of fact could have believed beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Green*, 713 S.W.3d at 878.

### b. Analysis

Appellant's complaints about Lyons's, Hill's, and M.A.'s testimony are misplaced in the context of a legal sufficiency analysis. In a legal sufficiency analysis, "we consider all of evidence admitted, whether proper or improper." *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001); *cf. Smith v. State*, 499 S.W.3d 1, 6 (Tex. Crim. App. 2016) ("Even evidence that is improperly admitted is considered in determining whether the evidence is sufficient to support a conviction[.]"). Further, we may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

Having thoroughly reviewed the evidence presented at both phases of Appellant's trial, we find that it amply supported the jury's affirmative answer to the future dangerousness special issue. In addition to introducing evidence of Appellant's murder of Deputy Dhaliwal, the State introduced evidence that Appellant had committed *another* murder—Ascenscio's—to prevent her from testifying at his parole revocation hearing. The parole revocation hearing had been initiated due to a prior assault that Appellant had perpetrated on Ascenscio by firing a gun next to her head. The State also introduced evidence that Appellant staged Ascenscio's body to look like Ascenscio had committed suicide, showing a lack of remorse by Appellant. Moreover, the State introduced additional evidence of Appellant's past crimes, including prior convictions for aggravated assault and aggravated kidnapping and juvenile adjudications for a string of home burglaries. The State further introduced evidence of Appellant's prison records, from as recently as the months leading up to this trial, most notably that he orchestrated a drug smuggling ring and tried to poison another inmate who owed him money. Lastly, the State introduced psychiatric testimony indicating that Appellant had psychopathic traits. The evidence of Appellant's future dangerousness was staggering.

Based on the evidence introduced at Appellant's trial, a rational trier of fact could have believed beyond a reasonable doubt that there was a probability

that Appellant would commit future criminal acts of violence that would constitute a continuing threat to society. *Green*, 713 S.W.3d at 878. We overrule Appellant's fourth point of error.

## IV.  Request to Withdraw Waiver of Counsel

In his first point of error, Appellant alleges that the trial court abused its discretion by denying his request to withdraw his prior waiver of counsel. Appellant appears to assert that the trial court's decision violated both his Sixth Amendment right to counsel as well as Code of Criminal Procedure Article 1.051(h). We also understand Appellant to ask us to consider reviewing "[Article] 1.051(h) case[s]" *de novo* rather than under an abuse-of-discretion standard.[10]

### a.  Factual Background

In his briefing, Appellant provides limited facts regarding the circumstances in which he waived his right to counsel and later attempted to withdraw that waiver. However, the record shows that, in the last few months before trial in this case was scheduled to begin, Appellant repeatedly expressed unhappiness with his appointed counsel. A consistent theme of Appellant's complaints regarding counsel, who had represented him for roughly three

---

[10] To the extent Appellant intends to raise any other claim, it is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

years at that point, was that they were violating his rights under "McCoy." Appellant claimed that counsel would not "discuss anything other than mitigation" and refused to focus their efforts on achieving Appellant's goal of being found not guilty of capital murder (or, apparently, any lesser offense). *See McCoy v. Louisiana*, 584 U.S. 414 (2018) (holding that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty").[11] Appellant also asserted that counsel were working in tandem with the district clerk and court coordinator to prevent him from complaining to the trial court about counsel, so that counsel could hide their alleged deficiencies and continue making money from Appellant's case.

Appellant repeatedly asked the trial court to remove counsel, raised the possibility of representing himself when the trial court declined to appoint different counsel, and asked the trial court for time to consider the option of self-representation. Indeed, Appellant spent approximately two months raising the prospect of self-representation with the trial court while simultaneously refusing to commit to either proceeding with appointed counsel

---

[11] We note that the record before us contains no indication that appointed counsel intended to insist that Appellant plead guilty to the charged offense or that they otherwise intended to concede his guilt at trial.

or proceeding *pro se*. It was not until the last day of jury selection, when trial was already underway, that Appellant affirmatively indicated that he wished the trial court to remove his appointed attorneys and allow him to represent himself.

The trial court then held a *Faretta*[12] hearing at which it admonished Appellant about the dangers and disadvantages of self-representation, informed him that it would not appoint stand-by counsel, and admonished him that he would not be allowed to obstruct the orderly proceedings of the court or interfere with the fair administration of justice. Appellant thereafter waived his right to counsel. The trial court dismissed appointed counsel from the case, and Appellant represented himself at trial from that point forward.[13]

During the guilt phase, Appellant engaged in the following behavior. He argued that the discovery material the State had previously provided to his appointed attorneys was inadmissible because the State had not also provided

---

[12] *Faretta v. California*, 422 U.S. 806, 818–19 (1975) (recognizing a Sixth Amendment right to self-representation).

[13] Appellant does not contend that he was improperly allowed to represent himself. *See Williams v. State*, 252 S.W.3d 353, 355–56 (Tex. Crim. App. 2008) (explaining that the Sixth Amendment right to counsel includes the reciprocal right to self-representation; once the right is clearly and unequivocally asserted, the trial court must inform the defendant about the dangers and disadvantages of self-representation so that the record establishes that the waiver of counsel is intelligently and voluntarily made); *see also Faretta*, 422 U.S. at 818–19. Further, the record supports the trial court's finding that Appellant voluntarily, knowingly, and intelligently waived his right to counsel.

it to Appellant personally. Although trial was underway, Appellant essentially asserted that the discovery process should start over because he was representing himself. He also alleged that the trial court's staff were thwarting him from filing legal documents.[14] Further, he complained that he did not have access to prior counsel's witness list, although the trial court noted that witness lists were available in the clerk's file.

Appellant also filed three motions for continuances, all of which were denied. He filed the first motion for continuance immediately after the trial court granted his request to proceed *pro se*. Although trial had already begun, Appellant claimed to need additional time to prepare for his defense. On the fourth day of the State's case-in-chief, Appellant argued his second motion for continuance, claiming that he was "nauseous" and "light-headed," and that he had vomited blood into a trash can. The prosecution vigorously disputed that assertion, as did the bailiff, who stated that, at most, Appellant had spat some saliva into a trash can. The trial court moreover made a record that it had not seen vomiting of any kind in the courtroom. Appellant made his third motion for continuance during his case-in-chief, claiming that he needed additional

---

[14] However, Appellant's own witness indicated that Appellant was still represented by counsel when she attempted to file the documents on his behalf. *See Jenkins v. State*, 592 S.W.3d 894, 902 n.47 (Tex. Crim. App. 2018) ("A defendant has no right to hybrid representation, and, as a consequence, a trial court is free to disregard any pro se motions presented by a defendant who is represented by counsel.").

time so that he could subpoena witnesses whom he had already cross-examined. Given the circumstances, the prosecution expressed its belief that Appellant's request for time was actually intended to "drag out" the trial. The trial court agreed, denying Appellant's request and describing it as "a tactic for delay."

Although the record contradicted his assertion, Appellant also repeatedly claimed that he could not prepare for his trial because he had no access to pens. He also contended that his work product had disappeared while he visited the jail infirmary. After the State rested its guilt phase case-in-chief, Appellant orally moved the trial judge to recuse himself due to the judge's alleged failure to provide Appellant with the time and material necessary to prepare a defense.[15]

Then, at the end of the guilt phase charge conference and immediately before closing arguments were set to begin, the trial court asked if Appellant had any other objections to the charge beyond the ones he had already made. This exchange ensued:

---

[15] The trial court briefly acknowledged the oral motion and proceeded with trial. Appellant's oral motion required no action by the trial court because the oral request did not comply with Texas Rule of Civil Procedure 18(a), which requires (among other things) that a motion to recuse to be in writing. *See* TEX. R. CIV. P. 18(a).

[APPELLANT]: No, Your Honor. However, at this time I would like to withdraw myself from my case and request appointed counsel.

[PROSECUTOR]: I think this is just for delay at this point, Judge.

THE COURT: Mr. Solis, we had a hearing. You've knowingly, voluntarily and intelligently waived your right to counsel. I instructed you at that time that you were not to use that as an attempt to delay or disrupt this court's proceedings.

[APPELLANT]: Yes, Your Honor.

THE COURT: I believe at this point your request at the time of closing is specifically to delay and disrupt these proceedings. Your request is denied at this time. I will reconsider if it become[s] pertinent based upon the jury's verdict.

Appellant did not object to the trial court's ruling or make any other response.

After the jury returned its verdict finding Appellant guilty of capital murder, the trial court polled the jury and then excused it from the courtroom. The trial court subsequently addressed Appellant.

THE COURT: At this time, Mr. Solis, I have considered your request for the appointment of counsel. I cannot appoint new counsel. You have freely, voluntarily and intelligently waived the effective assistance of counsel in this case. The Court has reached out to your former counsel, who have spent three years in preparing your defense. However, they

> believe, that based upon your dismissing them, that they are now conflicted out and they have declined to continue representing you even in punishment. At this point, because you have freely, voluntarily and intelligently waived the assistance of counsel, you must continue to proceed pro se.

[APPELLANT]:          Okay.

THE COURT:          The Court will be in recess.

The punishment phase began later the same day. In the jury's presence, the State read a punishment enhancement paragraph from the indictment which alleged that Appellant had previously been convicted of aggravated assault with a deadly weapon. When the trial court asked Appellant for his plea regarding the enhancement, he responded:

> Not true, Your Honor. And also, Your Honor, at this time I would like to object to your refusal of counsel to represent me in the sentencing phase and forcing me to proceed and be present for these proceedings when I asked to absent myself.

The trial court did not respond to Appellant's statement. It instead directed the State to proceed with its opening argument, which the State did. The withdrawal issue was not raised again during Appellant's trial.

### b. Appellant's Statutory Claim

We turn first to Appellant's assertion that the trial court abused its discretion under Article 1.051(h), which states:

> A defendant may withdraw a waiver of the right to counsel at any time but is not entitled to repeat a proceeding previously held or waived solely on the grounds of the subsequent appointment or retention of counsel. If the defendant withdraws a waiver, the trial court, in its discretion, may provide the appointed counsel 10 days to prepare.

TEX. CODE CRIM. PROC. art. 1.051(h). We have recently held that the Article 1.051(h) right to withdraw a prior waiver of counsel is not absolute. *See Huggins v. State*, 674 S.W.3d 538, 548–49 (Tex. Crim. App. 2023) (concluding that the statutory language "at any time" does not mean "under any circumstances" and that a defendant may not use his right to counsel to manipulate the court).

We conclude that Appellant has failed to preserve this aspect of his first point of error for appellate review. Appellant did not identify a legal basis for his initial request or later objection, and we do not believe that a statutory basis for it would have been obvious to the trial court or opposing counsel. *See Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016) (explaining that litigants need not employ specific words or technical considerations to avoid forfeiting their complaints; however, a general or imprecise objection will not preserve error for appeal unless the legal basis for the objection is obvious to the court and to opposing counsel); *see also Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) ("[A]ll a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks

himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."). Because Appellant failed to preserve his Article 1.051(h) allegation for appellate review, his associated argument—concerning the proper standard of review for such claims—is moot.

### c. Appellant's Sixth Amendment Claim

In his first point of error, Appellant claims he was denied effective assistance of counsel under the Sixth Amendment.

### i. *Appellant's claim is inadequately briefed*

We preliminarily conclude that Appellant's Sixth Amendment argument is inadequately briefed. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Appellant sets forth some law regarding a defendant's waiver of the Sixth Amendment right to counsel and the withdrawal of such a waiver. However, Appellant fails to apply the law he provides to the limited facts of the case he sets forth. Appellant merely makes conclusory statements about what the trial court did or did not review in denying his request to withdraw his prior waiver of counsel, as well as conclusory statements about the result to which Appellant believes he is entitled. Moreover, in his briefing for this point of error, Appellant rambles

from topic to topic and his arguments are often incoherent. Further, his briefing features incomplete sentences and missing or inaccurate citations to case law.

*ii. Merits*

Out of an abundance of caution, we nevertheless will review Appellant's Sixth Amendment contention. After such review, we conclude that the trial court did not abuse its discretion.

"It is beyond dispute that '[t]he Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process.'" *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013) (quoting *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004)). "It is just as well settled, however, that a defendant also has the right to 'proceed without counsel when he voluntarily and intelligently elects to do so.'" *Id.* (citing *Faretta*, 422 U.S. at 807). "To resolve the tension that can exist between these two principles when a defendant who elected to proceed pro se later demands an attorney, there is broad consensus that, once waived, the right to counsel is no longer unqualified." *United States v. Kerr*, 752 F.3d 206, 220 (2d Cir. 2014) (collecting cases).

That is, the exercise of the Sixth Amendment right to counsel "is subject to the necessities of sound judicial administration. Trial courts have the duty,

and discretion, to maintain the orderly flow and administration of judicial proceedings, including the exercise of a defendant's right to counsel." *Medley v. State*, 47 S.W.3d 17, 23 (Tex. App.—Amarillo 2000, pet. ref'd) (internal citation omitted); *see also Marquez v. State*, 921 S.W.2d 217, 223 (Tex. Crim. App. 1996) ("The control of the business of the court is vested in the sound discretion of the trial judge."). Although a waiver of the right to counsel may generally be withdrawn, a "defendant does not have the right to repeatedly alternate his position on the right to counsel and thereby delay trial or otherwise obstruct the orderly administration of justice." *Medley*, 47 S.W.3d at 23; *see also Culverhouse v. State*, 755 S.W.2d 856, 861 (Tex. Crim. App. 1988) ("A defendant may not use his right to counsel to manipulate the court or to delay his trial."). Moreover, "[a] defendant does not have a constitutional right to choreograph special appearances by counsel." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).

Here, it was on the cusp of guilt-phase closing arguments that Appellant attempted to withdraw his prior waiver of his right to counsel. Given the timing of the request alone, it was reasonable for the trial court to conclude that Appellant's request was made for the purpose of delay. Moreover, Appellant's behavior leading up his last-minute request to reclaim the right to counsel provides additional support for the reasonableness of the trial court's

conclusion. Appellant fails to show that the trial court would have been unreasonable to conclude that his request reflected the culmination of a pattern of behavior designed to manipulate the court and delay his trial.

Further, Appellant has not shown that the trial court abused its discretion when it revisited the issue and declined to appoint counsel for the punishment phase. At Appellant's insistence, the trial court had already dismissed appointed counsel from the case. The record shows that the trial court nevertheless contacted these attorneys to ask whether they would be willing to resume representing Appellant, but they were not, citing what they viewed as a conflict of interest. Further, there was no standby counsel at the ready. Appellant has not shown that, under these circumstances, the trial court would have been unreasonable to determine that appointing new counsel at this point during the trial would inevitably result in lengthy delay that would obstruct the orderly administration of justice.

Having concluded that Appellant's first point of error was either inadequately briefed or that the trial court did not abuse its discretion, we overrule it.

## V.    Challenge for Cause

In his second point of error, Appellant alleges that "the trial court reversibly erred and abused its discretion by improperly denying [his]

challenge for cause." Appellant's allegation is inadequately briefed because he fails to identify the challenge for cause that he believes the trial court erroneously denied. *See* TEX R. APP. P. 38.1(i).

In addition, our review of the record reveals that the trial court did not deny any of the defense's challenges for cause. Thus, Appellant's claim appears to have no basis in fact and may be properly characterized as frivolous. *Cf. Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (superseded by statute) (explaining that a complaint is frivolous where it lacks an arguable basis in either fact or law).

Further, Appellant concedes (and the record confirms) that he did not use all of his fifteen statutorily allotted peremptory challenges. *See* TEX. CODE CRIM. PROC. art. 35.15(a) (allotting the parties in capital cases fifteen peremptory challenges each). Therefore, even if Appellant could show that the trial court actually denied a defense challenge for cause, and that the trial court abused its discretion by doing so, he would not be able to show that the ruling harmed him. *See Newbury v. State*, 135 S.W.3d 22, 30–31 (Tex. Crim. App. 2004) ("[H]arm from the erroneous denial of a defense challenge for cause focuses on whether a peremptory challenge was wrongfully taken from the defendant.") (internal quotation marks and alterations omitted); *see also Comeaux v. State*, 445 S.W.3d 745, 750 (Tex. Crim. App. 2014) (stating that to

establish harm regarding the denial of a causal challenge, the appellant must show, among other things, that he exhausted his peremptory challenges, and the trial court denied his request for additional strikes). We overrule Appellant's second point of error.

## VI.    Extraneous Offense Evidence

In his fifth point of error, Appellant alleges that the trial court reversibly erred and abused its discretion when it admitted extraneous offense evidence during the punishment phase of his trial. Appellant invokes Rule of Evidence 403 and asserts that the trial court should not have admitted certain punishment phase testimony given by Lyons, Deputy Daniel Turner, Janice Peters, Brian Vaclavik, and M.A. because the testimony was unfairly prejudicial. *See* TEX. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."). However, Appellant did not preserve this claim for appellate review because at trial, he

failed to lodge Rule 403 objections to the testimony at issue.[16] *See* TEX. R. APP. P. 33.1(a)(1)(A).

Further, Appellant has inadequately briefed this point of error. See TEX. R. APP. P. 38.1(i). After summarizing the allegedly objectionable testimony given by these witnesses, Appellant conclusorily asserts that the testimony was unfairly prejudicial because it "insinuated" that Appellant committed certain bad acts (such as sexually assaulting Lyons, sexually abusing M.A., and murdering Ascencio) and suggested that money motivated him to kill Ascencio. At no point does Appellant explain why this evidence was unfairly prejudicial; he simply asserts that it was. *See Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010) ("Rule 403 does not require exclusion of evidence simply because it creates prejudice; the prejudice must be 'unfair.'"). We overrule Appellant's fifth point of error.

## VII. Constitutional Challenges to Article 37.071

In his sixth, seventh, and eighth points of error, Appellant raises various challenges to the constitutionality of Texas's death penalty statutory scheme. Specifically, Appellant argues that (1) his death sentence "is unconstitutional

---

[16] The record shows that Appellant made a "prejudice" objection during Turner's testimony when the State sought to admit certain photos of Ascencio's body. However, this objection was to the admission of the photographs rather than Turner's testimony.

because it was assigned based on [Texas's] arbitrary system of administering the death penalty" (point of error six); (2) his death sentence should be vacated because Texas's "statute governing capital trials expressly limits the evidence that a jury may consider mitigating, in violation of" the Eighth and Fourteenth Amendments (point of error seven); and (3) Texas's "10-12" rule, *see* TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1), violates the Sixth, Eighth, and Fourteenth Amendments because it prohibits a trial court from instructing the jury on the consequences of any failure to agree on the punishment phase special issues (point of error eight).

Appellant does not direct the Court to any motions he filed before or during trial in which he challenged the constitutionality of Texas's death penalty statute on these or any other bases, nor are we aware of any. Accordingly, Appellant has not preserved these three points of error for purposes of appeal. *See* TEX. R. APP. P. 33.1(a); *Reynolds v. State*, 423 S.W.3d 377, 383 (Tex. Crim. App. 2014) ("'As applied' constitutional claims are subject to the preservation requirement and therefore must be objected to at the trial court in order to preserve error."); *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009). ("[A] defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute.").

Further, Appellant fails to acknowledge that we have repeatedly rejected such claims. *See, e.g.*, *Coble*, 330 S.W.3d at 296–98. We are not persuaded by Appellant's arguments to revisit these issues. We overrule Appellant's sixth through eighth points of error.

## VIII. Conclusion

Finding no reversible error, we affirm the trial court's judgment and sentence of death.

**Delivered: October 30, 2025**
**Publish**